IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GREGORY DIFFENDERFER,** | : | Civil No. 1:16-cv-00934 |
| **Plaintiff,** | : | |
| v. | : | |
| **PENNSYLVANIA STATE EMPLOYEES CREDIT UNION,** | : | |
| **Defendant.** | : | Judge Sylvia H. Rambo |

## **M E M O R A N D U M**

In this civil action against his former employer, Plaintiff asserts claims for employment discrimination and retaliation under the Americans With Disabilities Act ("ADA"), the Pennsylvania Human Relations Act ("PHRA"), and the Family Medical Leave Act ("FMLA"). Presently before the court is Defendant's motion for summary judgment as to all claims. For the reasons stated herein, the motion will be granted in its entirety.

## **I.    Background**

In considering the instant motion, the court relied on the uncontested facts or, if the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to Plaintiff as the nonmoving party. *See Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358, 362 (3d Cir. 2008).

### A. Facts

Plaintiff Gregory Diffenderfer ("Plaintiff") was employed by Defendant Pennsylvania State Employees Credit Union ("Defendant") as a collections manager from October 2007 until 2014. (Doc. 20, Statement of Material Facts ("SMF"), ¶ 3; Doc. 25-3, Answer to SMF and Counter-Statement of Material Facts ("CSMF"), ¶ 3.) From approximately 2014 until his resignation in October 2016, Plaintiff had the title of senior collections manager and was exclusively responsible for Defendant's automobile loans. (SMF at ¶¶ 4, 10, 83; CSMF at ¶¶ 4, 10, 83.) Among Plaintiff's duties as a senior collections manager was to "develop and maintain reports that provide timely measurements of workflow, staff productivity and the effectiveness of unit operations," which "should display trending and provide data needed for forecasting." (SMF at ¶¶ 5-6; CSMF at ¶¶ 5-6.) Plaintiff was also responsible for disseminating information throughout the collections unit through frequent meetings. (CSMF at ¶ 7.)

In February 2000, prior to his employment with Defendant, Plaintiff received a simultaneous kidney and pancreas transplant, and subsequently experienced rejection problems with both transplanted organs at different points. (SMF at ¶ 11; CSMF at ¶ 11.) Plaintiff's medical issues required monthly blood tests which caused him to report for work late on days his blood was drawn. (SMF at ¶ 13; CSMF at ¶ 13.) Defendant never denied any of Plaintiff's requests for time

2

off for doctor appointments or blood tests, and did not require Plaintiff to use FMLA leave for these appointments. (SMF at ¶¶ 14-15; CSMF at ¶¶ 14-15.)

In November 2013, Plaintiff suffered a heart attack and was hospitalized. (SMF at ¶ 16; CSMF at ¶ 16.) As a result, Plaintiff missed work and used continuous FMLA leave from November 2013 until March 2014. (SMF at ¶ 17; CSMF at ¶ 17.) Plaintiff's physician, Dr. James Harvey, certified that Plaintiff would be able to return to work on March 11, 2014, provided that he not lift more than forty pounds and that he leave work at 2:45 p.m. three times per week until June 1, 2014 to attend cardiac rehabilitation. (SMF at ¶ 18; CSMF at ¶ 18.) Upon Plaintiff's return to work on March 11, 2014, Defendant notified him that he had exhausted all of his available FMLA leave. (Doc. 21, p. 247 of 353.) Plaintiff testified that although he did not recall receiving the notice, he did remember that in 2014 he had used all of his available FMLA leave. (*Id.* at p. 111 of 353.) Although Plaintiff had exhausted his FMLA leave, Defendant never denied his subsequent requests for time off. (*Id.*)

On April 2, 2014, Plaintiff received a written warning for his poor judgment in not complying with a cease and desist letter Defendant had received in relation to a collections account. (*Id.* at p. 193 of 353.) The warning noted that Plaintiff was "relied upon for his judgment" and that "[s]imilar incidents occurring in the future will result in further discipline up to and including termination." (*Id.*) Later in

3

April 2014, Stephen Hemler ("Mr. Hemler") became the Director of Consumer Debt Collections in Defendant's Credit Services Department, making him Plaintiff's direct supervisor. (SMF at ¶¶ 24-25; CSMF at ¶¶ 24-25.) Mr. Hemler indicated that he would give all employees now under his supervision, including Plaintiff, a clean slate. (SMF at ¶ 49; CSMF at ¶ 49.) Plaintiff felt Mr. Hemler was a positive change over his previous supervisor and felt that he and Mr. Hemler had a good working relationship. (SMF at ¶¶ 26-28; CSMF at ¶¶ 26-28.) During the months leading up to October 2014, however, Mr. Hemler noticed "a series of performance issues" with Plaintiff (Doc. 21 at pp. 274-75 of 353), and had multiple discussions regarding these issues with Nancy Deckert, an employee in Defendant's human relations department (*id*. at p. 285 of 353). Specifically, Mr. Hemler communicated to Plaintiff that he was not displaying a sense of urgency in completing tasks, requiring Mr. Hemler to repeatedly follow up with him. (*Id*. at pp. 123-24 of 353.)

On September 25, 2014, Plaintiff called to notify Defendant that he would be late to work because his daughter had fallen and he needed to take her to the hospital. (SMF at ¶¶ 29-30; CSMF at ¶¶ 29-30.) On September 29, 2014, Mr. Hemler emailed Plaintiff and asked if his time card needed to be updated to reflect his time off on September 25, 2014. (SMF at ¶ 33; CSMF at ¶ 33.) Plaintiff responded that he was confused by the question because he felt that, as an exempt

employee under Defendant's "Exempt Employees and Taking Time Off" policy, he did not need to use paid time off ("PTO") for occasional time missed as long as he worked at least four and one half hours in a work day. (SMF at ¶¶ 34-35; CSMF at ¶¶ 34-35.) Per Defendant's policy:

> Exempt employees taking time off are not required to take PTO if they work at least 4.5 hours on a given day. The reason for this policy is that it is understood that occasionally things come up like doctor appointments, family issues, or simply some kind of personal situation that needs to be dealt with. These types of circumstances may require coming to work late or leaving early, etc.

(Doc. 21 at p. 243 of 353.) The policy goes on to clarify that "[s]upervisors have the right to deny requests if they deem it necessary. This is always at the supervisor's discretion – not the employee's." (*Id*.) After Plaintiff and Mr. Hemler discussed the issue in person, during which there was no discussion of any of Plaintiff's medical issues, Mr. Hemler sent an additional email to Plaintiff, stating:

> Just as a follow up to our discussion, my preference is that we get 8 hours in per day. I'm perfectly fine with managers adjusting their hours or using PTO to make that happen but do ask that you email me and also obviously ensure that there is coverage. With so much on our plates and a good bit of work ahead of us, it would be hard for me to defend a 4.5 hour day as a full day[']s work.

(SMF at ¶¶ 39-40; Doc. 21 at p. 242 of 353.)

On October 2, 2014, Mr. Hemler received a spreadsheet via email from Dominick Elsener, Defendant's Director of Specialized Debt. (SMF at ¶ 58; CSMF

at ¶ 58.) The spreadsheet showed a decrease in the number of vehicles that were placed for repossession by Defendant during the previous several months, which would have been a positive development for the automobile loans collection group. (SMF at ¶¶ 60-61; CSMF at ¶¶ 60-61.) Mr. Hemler emailed the list to Plaintiff and asked him to confirm if the numbers appeared to be correct before sharing the spreadsheet throughout the collections group. (Doc. 21 at pp. 258-59 of 353.) Plaintiff confirmed that the numbers looked right, and agreed with Mr. Hemler that their recent practice of calling members earlier in the process and before vehicles had been assigned for repossession was helping. (*Id*. at p. 258.) The following day, Plaintiff received a call from Andrew Coy ("Mr. Coy"), Defendant's Assistant Vice President of Credit Services, and confirmed again that the spreadsheet appeared to be accurate. (SMF at ¶¶ 65-66; CSMF at ¶¶ 65-66.)

After Plaintiff's communications with Mr. Hemler and Mr. Coy, the information contained in the spreadsheet regarding the number of vehicles placed for repossession was shared with Defendant's President and Chief Executive Officer, Gregory Smith ("Mr. Smith"), as well as Defendant's Board of Directors. (Doc. 21 at p. 299 of 353.) It was subsequently discovered that the decrease in reported repossessions was not due to the early calling practice, but because certain automobile loan accounts were not being worked by the staff in Plaintiff's collections group. (SMF at ¶¶ 70-71; CSMF at ¶¶ 70-71.) The unworked accounts

were not in the main workflow queue, but rather in the "45-day queue," which was comprised of automobile loan accounts that needed to be assigned for repossession. (Doc. 21 at pp. 145-48 of 353.)

At some point between October 3, 2014 and October 6, 2014, a collective decision to terminate Plaintiff's employment was made by Mr. Hemler, Ms. Deckert, Mr. Coy, and William Zysk, Defendant's Vice President of Credit Services. (SMF at ¶¶ 80-81; CSMF at ¶¶ 80-81.) Mr. Hemler and Ms. Deckert drafted a Corrective Action Plan, which described the reasons behind, and recommendation for, Plaintiff's termination. (Doc. 21 at pp. 349-50 of 353.) On October 6, 2014, Mr. Hemler and Ms. Deckert met with Plaintiff to discuss his termination, during which Plaintiff was offered and accepted the opportunity to resign instead of having his employment terminated. (SMF at ¶¶ 79, 83; CSMF at ¶¶ 79, 83.)

### B. <u>Procedural History</u>

Plaintiff initiated this action by filing a complaint on May 19, 2016. (Doc. 1.) On December 21, 2016, the parties jointly requested and were granted an extension of time to complete discovery. (Docs. 14 & 15.) On March 31, 2017, Plaintiff requested and was subsequently granted a second extension of the discovery deadline. (Docs. 16 & 17.)

On May 31, 2017, Defendant filed a motion for summary judgment, along with a statement of material facts and appendix thereto, as well as a brief in support of its motion. (Docs. 19-22.) After Plaintiff was granted an extension of time to respond to the motion (Doc. 24), he submitted a brief in opposition and counter-statement of material facts (Docs. 25 & 26). Defendant filed a timely reply brief (Doc. 26) and the motion is ripe for disposition.

## II.     Legal Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate when no genuine issue exists as to any material fact and when the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A fact is "material" if "proof of its existence or nonexistence would affect the outcome of the lawsuit under the law applicable to the case." *Burke v. TransAm Trucking, Inc.*, 605 F. Supp. 2d 647, 650 (M.D. Pa. 2009). An issue of material fact is genuine if "the evidence is such that a reasonable jury might return a verdict for the non-moving party." *Id.*

When considering a motion for summary judgment, a court must look beyond the pleadings and into the factual record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The nonmoving party may not merely restate allegations made in the pleadings or rely upon factually unsupported legal conclusions. *See id.* at 323-24. Instead, the nonmoving party must support each essential element of its claim

8

with specific evidence from the record. *Id.* at 317. All factual doubts and reasonable inferences are to be resolved in favor of the nonmoving party. *Id.*

The moving party has the initial burden of proving that no genuine issue of material fact exists. *See id.* at 323. Once this burden is met, the burden shifts to the nonmoving party to produce evidence proving the existence of every essential element to its case. *Id.* The nonmoving party must then "go beyond the pleadings by way of affidavits, depositions . . . or the like in order to demonstrate specific material facts which give rise to a genuine issue." *Id.* at 324. In considering a motion for summary judgment, the court is not to engage in credibility determinations or the weighing of evidence. *Burke*, 605 F. Supp. 2d at 650. Instead, when the credibility of witnesses is at issue or when conflicting evidence must be weighed, a trial is needed. *Id.*

## III. Discussion

In his complaint, Plaintiff asserts discrimination and retaliation claims under the ADA (Count I), the PHRA (Count II), and the FMLA (Count III). Defendant has moved for summary judgment as to all counts. As an initial matter, the court notes that "[t]he analytical framework used to evaluate a disability discrimination claim under the PHRA is effectively indistinguishable from that under the ADA, thus allowing courts to dispose of both ADA and PHRA claims on the same grounds." *See Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 143 n.5 (3d Cir.

2011) (citing *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002)). Thus, the court will address Plaintiff's ADA and PHRA claims contained in Counts I and II, respectively, together, before moving on to his FMLA claim contained in Count III.

### A. <u>**ADA and PHRA Claims**</u>

Plaintiff claims that Defendant discriminated against him in violation of both the ADA and PHRA when it terminated his employment. In order to establish a *prima facie* discrimination claim under the ADA, Plaintiff must show that he suffered an adverse employment action as a result of his disability. *See Stadtmiller v. UPMC Health Plan, Inc.*, 491 F. App'x 334, 336 (3d Cir. 2012). Thus, Plaintiff must establish "that intentional discrimination was the *but for* cause of" his termination from employment. *Gillette v. Donahoe*, 622 F. App'x 178, 181 (3d Cir. 2015) (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 301 (3d Cir. 2007)).

Plaintiff argues that he suffered "ongoing antagonism" due to his disability in the months leading up to his termination. The undisputed material facts, however, simply do not support his argument. Plaintiff was never denied any requests to attend doctor appointments or get blood tests, and none of Defendant's employees ever made any comments to Plaintiff regarding his medical issues or suggested that he was taking too much time off. Plaintiff points to his attendance at

a July 2, 2014 post-surgery appointment, and argues that an email approximately one month later from Ms. Deckert to Mr. Hemler regarding Plaintiff's performance and his April 2014 Corrective Action Plan is unduly suggestive of Defendant's discriminatory motive. The court disagrees. The record shows that when Plaintiff stated he would need time off for the appointment, Mr. Hemler responded, "[t]hank you Greg. Praying everything is good." The record further shows ongoing performance issues from Plaintiff, ranging from poor judgment that lead to the written warning in April 2014, to an unreported backlog of accounts needing to be assigned for repossession that caused inaccurate information to be relayed to the CEO and Board of Directors in October 2014. Based on the undisputed material facts on record, the court finds that Plaintiff has failed to establish a *prima facie* case that discrimination based on his disability was the but for cause of his termination from employment.[1]

Plaintiff also contends that Defendant retaliated against him in violation of the ADA. To establish a *prima facie* case for retaliation, Plaintiff must show that: 1) he engaged in protected activity; 2) he suffered an adverse action either contemporaneous to or after his protected activity; and 3) there is a causal connection between his protected activity and the adverse action. *See Isley v. Aker*

---

[1] Having found that Plaintiff has failed to establish his *prima facie* case, the court need not address whether Defendant's proffered reason for termination of poor performance was merely pretextual.

11

*Phila. Shipyard, Inc.*, 275 F. Supp. 3d 620, 632 (E.D. Pa. 2017) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)). Here, Plaintiff has failed to advance any argument or facts in support of this claim. The complaint merely includes the word "retaliation" a single time at the end of Count I. The court cannot find anything in the record to show that Plaintiff engaged in any protected activity – *e.g.*, opposing an practice made unlawful under the ADA or participating in an ADA investigation or hearing, *see Merit v. Septa*, 315 F. Supp. 2d 689, 704 (E.D. Pa. 2004) – or that there was a causal connection between his protected activity and termination of his employment. Accordingly, the court will award summary judgment to Defendant on Counts I and II.

### B. FMLA Claims

In Count III, Plaintiff asserts both interference and retaliation claims in violation of the FMLA. The court will address each claim in turn. In order to establish an interference claim, a plaintiff must show that:

> (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

*Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014) (quoting *Johnson v. Cmty. Coll. of Allegheny Cty.*, 566 F. Supp. 2d 405, 446 (W.D. Pa. 2008)). "[I]nterference

includes 'not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'" *Grosso v. Fed. Express Corp.*, 467 F. Supp. 2d 449, 463-64 (E.D. Pa. 2006) (quoting 29 C.F.R. § 825.220(b)). The plaintiff "bears the initial burden of showing [the] elements of the interference claim." *Lichtensteain v. Univ. of Pitt. Med. Ctr.*, 691 F.3d 294, 312 (3d Cir. 2012) (quoting *Michniewicz v. Metasource, LLC*, 756 F. Supp. 2d 657, 666 (E.D. Pa. 2010)).

Here, Plaintiff bases his interference claim on the incident on September 25, 2014, in which he arrived to work late after taking his daughter to the hospital, wherein Mr. Hemler told Plaintiff that he either needed to make up the time or use PTO. Even if it were not in Mr. Hemler's discretion according to Defendant's Exempt Employees and Taking Time Off policy to pose this choice to Plaintiff, which it appears to have been, Plaintiff did not request FMLA leave and therefore was not denied such leave.[2] Further, Defendant had advised Plaintiff when he returned from his absence after a heart attack back in March 2014 that he had exhausted all of his FMLA leave. Accordingly, the court finds that Plaintiff has not met his burden of establishing the initial elements of his interference claim.

Turning to his retaliation claim, Plaintiff would need to establish that "(1) [ ]he invoked h[is] right to FMLA-qualifying leave, (2) [ ]he suffered an adverse employment decision, and (3) the adverse action was causally related to h[is]

---

[2] Plaintiff has also failed to produce any evidence that would support a claim that Defendant discouraged or inhibited him from exercising his rights under the FMLA.

invocation of rights." *Ross*, 755 F.3d at 193 (quoting *Lichtenstein*, 691 F.3d at 302) (alterations in original). Here, Defendant does not dispute that Plaintiff took FMLA leave, or that his termination was an adverse employment decision. Thus, the only question is whether there is a causal connection between the two. "Where the temporal proximity is not 'unusually suggestive,' we ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)).

More than six months passed between Plaintiff's return from FMLA leave in March 2014 and his termination from employment on October 6, 2014. Courts have routinely found much smaller amounts of time not unduly suggestive of a retaliatory motive. *See, e.g.*, *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (holding that temporal proximity of just over two months was not enough to establish causation); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (holding a temporal proximity of approximately three weeks could not raise issue of material fact as to causation in a retaliation claim). Although Plaintiff attempts to frame his September 25, 2014 late arrival to work as "FMLA qualified time," as discussed above, he never requested FMLA leave for that day, and thus the court will not consider that as part of his retaliation claim.

Thus, the court finds that the temporal proximity between Plaintiff's exercise of FMLA rights and the termination of his employment is not unduly suggestive.

Looking at the remainder of the proffered evidence as a whole, the court finds no basis upon which to infer a retaliatory motive on the part of Defendant in deciding to terminate Plaintiff's employment. He requested FMLA leave following his heart attack, Defendant granted that request, and Plaintiff exhausted all of his FMLA time. Upon his return to work, Plaintiff was never denied time off for any subsequent doctor appointments, blood tests, or to take his daughter to the hospital. It was not until nearly seven months after Plaintiff's exercise of FMLA rights, and immediately following Plaintiff's role in providing inaccurate information regarding Defendant's automobile collections accounts to Defendant's CEO and Board of Directors, that Plaintiff's employment was terminated. Accordingly, the court finds that Plaintiff has not provided sufficient facts to establish *prima facie* FMLA claims, and the court will award summary judgment to Defendant as to Count III.

## IV. Conclusion

For the reasons stated herein, the court finds that Plaintiff has failed to create a genuine dispute of material fact as to any of his ADA, PHRA, or FMLA discrimination or retaliation claims, and that Defendant is therefore entitled to

summary judgment as to Counts I, II, and III in the complaint.

An appropriate order will issue.

s/Sylvia H. Rambo  
SYLVIA H. RAMBO  
United States District Judge

Dated: March 22, 2018